# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 13, 2014

## IN RE HANNAH H., ET AL.

### Appeal from the Juvenile Court for Sevier County
### Nos. 12-001690, -001692   Hon. Dwight E. Stokes, Judge

---

### No. E2013-01211-COA-R3-PT-FILED-JUNE 10, 2014

---

This is a termination of parental rights case.  Following a hearing, the trial court found clear and convincing evidence existed to support the termination of the parental rights of both the mother and the father on the statutory grounds of abandonment based on failure to provide a suitable home, failure to substantially fulfill the requirements of the permanency plans, and persistence of conditions.  Tenn. Code Ann. §§ 36-1-113(g)(1)-(3), 36-1-102(1)(A)(ii), 37-2-403(a)(2).  The court further concluded that termination was in the best interest of the children.  Tenn. Code Ann. § 36-1-113(i).  The mother and father appeal.  Finding no reversible error, we affirm the decision of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Shauna L. Boyd, Kodak, Tennessee, for the appellant, Taymie B.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Justin F.

Robert E. Cooper, Jr., Attorney General and Reporter, and Jordan Scott, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Tim Gudmunson, Sevierville, Tennessee, Guardian ad Litem.

## OPINION

## I. BACKGROUND

Taymie B. ("Mother")[1] is the mother of Hannah H. (D.O.B. 5/31/02) and Justine R. (D.O.B. 4/12/06) (collectively, "the Children"). Justin F. ("Father") is Justine's biological father. Lance H.[2] is Hannah's father. A third child, Destiny, also lived with Mother and Father, but at the time of trial, she was in the custody of her father, David R.[3] Parental rights relating to Destiny are not at issue in this appeal.

The first contact of the Department of Children's Services ("DCS") with this family occurred after a domestic violence incident in June 2010, when Mother called the police and attributed bruises on Hannah's legs to physical abuse by Father. Mother and Father later stipulated to a history of domestic violence, and the Children were adjudicated dependent and neglected. Father eventually moved back in with the family on the stipulation that he would complete anger management classes.

Subsequently, Mother obtained two orders of protection (November 2010 and September 2011) against Father. She also obtained a no contact order against him after Father began yelling and kicked a hole through a wall. In her petition for the second order of protection, Mother related that: Father had a prior domestic violence charge; he had a prior child abuse incident; he was not following through with his anger management treatment; and she was in fear for the lives of herself and the Children.

On October 11, 2011, the Children came into DCS custody upon a petition for temporary legal custody, in which it was alleged that: Hannah H. was severely abused due to sexual abuse by Father; Mother had allowed ongoing contact between Hannah H. and Father after the alleged abuse; Mother admitted to a history of domestic violence with Father; and all three children were dependent and neglected. After an investigation, no charges were filed against Father related to the purported sexual abuse, but the Children later were adjudicated dependent and neglected based upon stipulations and findings that: Mother and Father had a history of domestic violence; the Children had witnessed the violence; and Mother and Father had unstable housing, transportation, and income.

---

[1]Taymie B. also appears in the record as Taymie R.

[2]Lance H. surrendered his parental rights prior to the proceedings in November 2012.

[3]David R. is the "legal" father of Justine. He acknowledged that he is not the biological father of either child at issue in this matter.

At the time of the removal, despite there being an active order of protection against him, Father was in the home with Mother and the Children when DCS arrived.[4] Father acknowledged at trial that he had been residing with Mother and the Children: "We had a very stable house. Our kids were going to school. They were in daycare. . . ." He further testified that he only moved out of the home after DCS removed the Children: "I ha[d] not resided anywhere except my home until you abducted my children." Father further described their living arrangement as lasting six or seven years through the date of removal:[5]

> Well, if you were a single mother and you had someone residing with you for six, seven years taking care of you as a family and then all of a sudden – your kids get abducted and the man has to leave because you can't get your kids back if you stay with this man[.]

After the removal, during the course of her therapy, Hannah divulged additional allegations of physical abuse by Father. She informed the therapist: "He would hurt me" and "I was abused." Hannah related to the therapist that she did not "want to go back to that."

DCS developed and ratified a permanency plan on October 24, 2011, and another on April 5, 2012. Mother's plans required her to: continue therapy; complete domestic violence counseling through the YWCA or other approved entity; and demonstrate parenting skills, including the ability to protect. Her plans also required that she: submit to random drug screens; maintain adequate housing, a legal source of income, and reliable transportation; ensure that child-care providers are approved by DCS and the guardian ad litem; abide by all court orders and attend all court hearings; comply with the terms of the probation and refrain from obtaining new charges; pay child support; participate in family therapy when deemed appropriate; obtain education regarding the care of a sexually abused child; establish a safety plan; comply with medication management; and complete a parenting assessment.

The goal of Father's plans was to address his anger and domestic violence issues. He was required to: successfully complete anger-management and domestic violence education; submit to a parenting assessment and follow all recommendations; and display appropriate parenting skills. His plans also required him to maintain adequate housing, comply with all court orders, comply with his probation and not obtain any new charges, pay child support, submit to random drug screens, undergo psychosexual evaluation, attend all court hearings, maintain reliable transportation, comply with DNA testing, obtain education concerning

---

[4]He escaped through a screen in the back of the home.

[5]These statements discredit Father's argument on appeal that the Children were removed from Mother's home rather than "his" home.

sexually abused children, establish a safety plan, and participate in family therapy when appropriate.

During the first four months following removal, Mother located housing at Safe Space, a domestic violence shelter, and DCS attempted to set up counseling. DCS explained the requirements of the permanency plan to Mother, made attempts to verify her employment, and referred her to a DCS-funded parenting and psychological assessment. However, Mother soon moved to West Tennessee to reside with her father, an alcoholic with prior charges of domestic abuse who, according to Father, "did [Mother] wrong and stuff." Mother contended that she made the move to avoid DCS because she felt harassed. The DCS caseworker nevertheless discussed counseling with Mother and urged her to enroll in therapy in West Tennessee. DCS arranged gas cards for Mother to travel back to East Tennessee for visits with the Children, but the cards were never picked up.

When Mother eventually returned to East Tennessee, DCS once again contacted service providers for her. DCS arranged free parenting classes; provided supervised visitation through a third-party provider; provided transportation for the Children to visits; conducted a home study; provided the Children with psychological, medical, and dental care; provided the Children with transportation to appointments; and invited Mother to child and family team meetings. Despite DCS's efforts, her caseworker described Mother as "confrontational and demanding."

Mother continued to be resistant to establishing counseling or domestic violence therapy despite DCS urging her to submit to such services. She even lied to DCS about starting counseling prior to ever pursuing it. She did not begin counseling until July 2012, approximately nine months after the removal of the Children from her custody. Her therapist testified at trial that she initially referred Mother to a skills-focused group to learn how to protect herself from domestic violence, but Mother attended only one session. A couple of months later – after DCS filed for termination – Mother began attending a weekly women's support group, but only provided proof of attendance for three sessions in the span of three months. The therapist opined that this support group did not provide the necessary skills Mother needs to protect herself and the children from domestic violence. She maintained that Mother needed a skills-focused group like the first referral. The therapist observed that Mother "tends to be more anxious around [Father]."

For much of this case, Mother maintained housing. However, the DCS caseworker testified that Mother was evasive and would not provide requested documentation regarding housing, employment, or other income on a regular basis.

Father initially was unavailable to DCS, as he was in jail at least twice in the first four

months after removal. He admitted that his time in jail hindered DCS from providing him with services. He did not contact DCS for the first time until almost five months after the Children were removed, at which time Father left a lengthy, confrontational message for a DCS caseworker and was "very aggressive." As a result, the caseworker became concerned about the safety of visits in Mother's home and discontinued them. After his release from incarceration, Father refused to give an address or any information about where he was staying or what he was going to be doing. Despite denying that he was homeless when not incarcerated, Father never obtained housing in his name. Rather, he relied on friends and a support network to house him. He lived with a friend and then began living with Mother's parents about a month prior to the trial. He did not pay rent at Mother's parent's home. Prior to trial, Father was in jail on two additional occasions.

For Father, DCS funded a comprehensive parenting assessment that included observation of him with Justine, arranged free parenting classes, invited Father to child and family team meetings, explained the permanency plans and the criteria for termination, referred Father to domestic violence treatment, and funded his enrollment in *Team Dad* (a program covering a broad spectrum of parenting and life skills). DCS also attempted to work with Father to help him complete the unfinished requirements of the plans.

When Father ultimately submitted to the parenting assessment over a year after the Children were removed, he did not follow its recommendations. Most importantly, Father did not enroll in dedicated domestic violence training as required by the permanency plans. He did enroll in the *Team Dad* course, and he claimed at trial that he was told it would "address it all." However, this program only devoted 90 minutes to domestic violence. Further, he provided no proof of completion of it until months later. The *Team Dad* caseworker related at trial that the program "could not be described as a domestic violence course," and a DCS caseworker observed that the program only addressed domestic violence "a very small amount." It also is noteworthy that Father did not request phone calls with Justine.

During the time frame of this case, Mother became engaged to another man against whom an order of protection had been entered by a previous girlfriend. According to Mother, the relationship ended when someone told DCS that the boyfriend was molesting his daughter, and he "felt like he was being trapped by the Department," since Mother had lost custody of the Children.

Meanwhile, Hannah and Justine were living in an appropriate pre-adoptive foster home. The DCS case worker testified that the Children were loving and warm toward the foster family and would initiate physical contact and approach the foster parents for hugs. It was reported that Hannah stated the foster father was one of the first people who did not

lie to her, and that she viewed him as a positive male figure in her life. The foster mother testified that she was employed and able to provide for the Children long term. The home was described as clean and large enough to accommodate the Children. There had been an incident involving lice, but the matter was addressed by the foster family. Hannah was in Girl Scouts and both girls played softball. Hannah was making good grades, and Justine was doing well in daycare. The Children further engaged in swimming, biking, and boating with the foster family. The foster mother related that she loved the Children "very much." Hannah's therapist opined that a change in caretakers would be detrimental.

On October 23, 2012, DCS filed a petition to terminate parental rights. Later at trial on March 22 and April 12, 2013, Father trivialized two episodes of abuse. When describing one incident, Father explained that he left bruises on Hannah's legs because she kept moving around during a spanking he was giving her with a yardstick. In a second incident, he held Hannah over a toilet, placed her hair in the water, and flushed. He denied the incident was punishment, claiming instead that it was a "big joke." Father indicated that he believed domestic violence to be commonplace and trivial; he commented: "don't we all have a history of domestic violence?" Further, despite claiming that anger issues were no longer a part of his life, Father had numerous angry outbursts at trial. The court noted that it "witnessed first-hand [Father's] inability to control himself and to control his anger. Even his Counsel did not have the ability to control him."

Mother acknowledged during her trial testimony that if she recovered custody of the Children, Father could not be around them unsupervised until he completed "some type of class to help him learn how to handle his emotions." Mother related her awareness that DCS did not approve of her continuing relationship with Father while his domestic violence issues went untreated, but she nevertheless continued letting him stay in her house approximately three nights per week. Father informed the court that, "[i]n God's eyes," he was married to Mother, and he referred to Mother's parents as father-in-law and mother-in-law. They owned a vehicle jointly, and Mother provided Father with transportation for *Team Dad* classes and court dates – even driving to court together for the trial. Mother observed that she turned to Father if she needed help with anything because they were "kind of like a support group for each other."

Mother and Father both admitted at trial that they used marijuana to help with their stress. At a child and family team meeting approximately three months after DCS petitioned for termination, Mother admitted that she would test positive for marijuana. Just weeks before the trial, she failed a drug screen, testing positive for benzodiazepines, marijuana, and oxycodone. In a subsequent drug and alcohol assessment, she admitted that she had been using marijuana and oxycodone. On the day of trial, Mother admitted that she would test positive for benzodiazepines, which she used to manage panic attacks. She never provided

a prescription for the benzodiazepines or the oxycodone. Despite only discovering Mother's drug use a short time before the termination trial began, DCS immediately began providing services to address the issue.

At the conclusion of the trial, the court found that DCS had proven three grounds for termination of parental rights by clear and convincing evidence: (1) abandonment for failure to provide a suitable home; (2) substantial noncompliance with the permanency plans; and (3) persistent conditions.

The trial court determined that there was a "substantial history of domestic violence," and that Mother and Father willfully failed to provide a suitable home for the children in that they "have created conditions . . . which render it unsafe, namely, their total denial of the domestic violence." The court noted that Mother and Father, lacking in credibility, "have made light of the domestic violence issues, acting like they do not exist, minimizing the conditions in the home and a complete failure to comply with the permanency plan. . . . [Their] actions render the home unsafe." The court observed that Mother and Father failed to take advantage of "significant" services offered by DCS and had not "adequately addressed domestic violence in any way that even remotely resolve[d] the problem." The court continued: "There cannot be a proper home, a safe home, a stable home when the mother continually elects the relationship with [Father] over her obligations in regard to the children." The court further found that the presence of drugs and alcohol in the home rendered it unsafe along with Father's inability to control his anger. The trial court held that Mother and Father had "failed to comply in a substantial manner with those reasonable responsibilities set out in the [permanency] plans. . . ." Finally, the court concluded that termination of Father's and Mother's parental rights was in the best interest of the Children. Accordingly, the court terminated their parental rights on April 30, 2013. Mother and Father filed a timely appeal.

## II. ISSUES

We consolidate and restate the issues raised by Mother and Father on appeal as follows:

a. Whether clear and convincing evidence supports the trial court's termination of the parental rights of Mother and Father on the grounds of persistence of conditions, abandonment by failure to establish a suitable home, and substantial noncompliance with their permanency plans.

b. Whether clear and convincing evidence supports the trial court's

determination that termination of the parental rights of Mother and Father was in the Children's best interest.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental rights termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim.* State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).

## IV. DISCUSSION

## A. GROUNDS FOR TERMINATION

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights. The applicable provisions read as follows:

> **36-1-113. Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> * * *
>
> (c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

* * *

(g)  Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g) . . . :

(1)  Abandonment by the parent or guardian, as defined in 36-1-102, has occurred;

(2)  There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

(3)  The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

Tenn. Code Ann. § 36-1-113(a), (c), and (g)(1)-(3)(A)-(C).  The party petitioning for termination carries the burden of proof. *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App.

2004).  The requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away."  *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

### (1)  ABANDONMENT FOR FAILURE TO PROVIDE A SUITABLE HOME

We first consider the trial court's termination of parental rights based on abandonment for the failure to provide a suitable home.  A parent may be found to have abandoned his or her child by failing to establish a suitable home.  The relevant statutory provision provides that abandonment for the failure to provide a suitable home occurs when

> The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.  The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).  Termination pursuant to the ground of abandonment for failure to provide a suitable home requires a finding, supported by clear and convincing evidence, that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home.  Tenn. Code Ann. § 36-1-102(1)(A)(ii).  *See generally In re R.L.F.*, 278 S.W.3d 305, 315-16 (Tenn. Ct. App. 2008) (providing that DCS must submit clear and convincing evidence to establish that it expended reasonable efforts in assisting the parent when a termination ground based upon DCS's

-11-

efforts is implicated).  The four-month time period relevant to our analysis of this issue is October 11, 2011, to February 11, 2012.

A "suitable home requires more than a proper physical living location." *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). It requires that the home be free of drugs and domestic violence. *Id.*

DCS's efforts do not need to be "Herculean."  DCS is required to use its "superior insight and training to assist parents with the problems DCS has identified in the permanency plan, whether the parents ask for assistance or not."  *State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008).  DCS does not bear the sole responsibility.  Parents also must make reasonable efforts toward achieving the goals established by the permanency plan to remedy the conditions leading to the removal of the child.  *Id.*  The burden is on the state to prove by clear and convincing efforts that its efforts were reasonable under the circumstances.  *Id.*

## Father

After contact was established with Father by DCS, he was aggressive and confrontational.  It appears he never obtained his own housing, and he refused to give an address or any information about where he was staying or what he was going to be doing. Father did not begin working the permanency plans until after DCS filed its petition for termination, and he did not follow the recommendations of the parenting assessment. Significantly, he failed to complete domestic violence treatment and continued having angry outbursts. Father did not provide proof of completion of the *Team Dad* program until months later. In addition, he admitted to drug use.  He never requested phone calls with his daughter.

Accordingly, despite reasonable efforts by DCS, Father did not provide a suitable home due to his lack of housing, drug use, and untreated domestic violence and anger issues. The efforts of DCS were frustrated by Father's lack of cooperation.  Father's lack of concern throughout the entirety of this case, and his unwillingness to remedy his domestic violence, anger, and housing issues, demonstrated a lack of concern for the welfare of the Children that rendered him incapable of providing a suitable home at an early date.  The evidence of record supports the determination of the trial court that the parental rights of Father should be terminated pursuant to this ground.

**Mother**

Admittedly, Mother maintained housing, had intermittent employment, and completed a parenting class, but she did little to address the major concern in this case: domestic abuse. Mother was evasive and did not provide documentation of housing or employment on a regular basis. Even when she finally began therapy – over nine months after the removal of the Children – she made little progress until shortly before the trial. Her resistance to therapy and her lack of progress prevented the therapy from fully addressing the domestic violence issues. Mother also continued her relationships with abusive men.

Further, Mother began using drugs. The continuing presence of an abusive boyfriend and drug abuse rendered Mother's home unsuitable. *See State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). Mother's drug use and her failure to address the domestic violence issues and/or end her relationship with Father demonstrate a lack of concern for the welfare of the Children such that it was unlikely that the conditions would be remedied at an early date. *See In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000). Accordingly, the trial court correctly terminated her parental rights under this ground. The record supports the trial court's finding that DCS made reasonable efforts to assist Mother over the specific four-month period and the entirety of the case. Despite these efforts, Mother failed to establish a suitable home.

## (2) SUBSTANTIAL NONCOMPLIANCE WITH PERMANENCY PLANS

We next address termination of parental rights based on substantial noncompliance with the permanency plans as set forth in Tennessee Code Annotated section 36-1-113(g)(2). A court may terminate parental rights when a parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan or a plan of care." Tenn. Code Ann. § 36-1-113(g)(2). Under this ground, the court must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement. Tenn. Code Ann. § 37-2-403; *see In re Valentine*, 79 S.W.3d at 547. Conditions that necessitate foster care placement "include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547 (finding a stable housing requirement reasonable and related to conditions necessitating foster care placement even though the reason for removal was abuse). The trial court must then find that the noncompliance is substantial. *In re M.J.B.*, 140 S.W.3d at 656. To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. Jun. 3, 2003).

Domestic violence was the primary reason the Children came into custody and domestic violence was the most important issue in this case. Accordingly, the permanency plans for Mother and Father sought to remedy this condition. Such requirements were reasonable and related to the primary condition preventing family reunification.

**Father**

Father's requirements were reasonable and related to the domestic violence issues and other issues preventing reunification that were present in the case. However, Father failed to complete the domestic violence course that DCS referred him to, arguing instead that he satisfied the treatment requirement in the permanency plan by enrolling in *Team Dad*. DCS established that *Team Dad* was not an adequate substitute for domestic violence treatment. Father did complete a parenting assessment, but he did not follow through with the recommendations, including one that he complete an anger management evaluation and domestic violence treatment. Father continued having outbursts of anger. He also had been without a home since he was released from jail, relying instead on the goodwill of others for housing. The proof established that the trial court correctly terminated Father's parental rights under this ground.

**Mother**

We acknowledge that Mother addressed certain requirements of the permanency plans. However, she did not complete any of the action steps directly related to domestic violence, the most important issue in the case. Mother did not submit to therapy until nine months after her Children were removed, and even after she began therapy, she made little progress until shortly before the trial. She attended one session of the skill training classes required by the plans and only sporadically attended her support group. Mother also failed to demonstrate the ability to protect her Children by continuing her relationships with abusive men. Mother's noncompliance was substantial. Accordingly, the trial court correctly terminated her parental rights under this ground.

## (3) PERSISTENCE OF CONDITIONS

A court may terminate parental rights for persistence of conditions when a child has been removed from the home of the parent by a court order for at least six months and conditions preventing the safe return of the child to the parent's custody still persist. Tenn. Code Ann. § 36-1-113(g)(3)(A). This ground also requires the trial court to find that there

is "little likelihood that these conditions will be remedied at an early date," and that the "continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(B)-(C).

The conditions supporting this ground need not be the same conditions that led to the child's removal. *See In re M.A.R.*, 183 S.W.3d 652, 664 (Tenn. Ct. App. 2005). Instead, this ground can also exist on the basis of "other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect." Tenn. Code Ann. § 36-1-113(g)(3)(A). Such other conditions can include domestic violence and drug use. *See In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *15 (Tenn. Ct. App. Mar. 2, 2009).

## Father

Father admitted to a history of domestic violence while living with Mother and the Children, but he failed to remedy his anger issues. He did not enroll in domestic violence training as required by the permanency plans and encouraged by DCS. The record and his trial testimony reveal that he trivialized the abuse he inflicted on the Children. He admitted to using illegal drugs after DCS filed its petition for termination.

Due to the fact that Father appeared unable to recognize that his domestic violence issues needed to be addressed and that he needed dedicated domestic violence treatment, Father was unlikely to remedy this condition at an early date. His inability to address his lack of housing, drug use, and pattern of criminal behavior throughout the course of the case likewise indicated that he was unlikely to remedy the conditions preventing him from regaining custody of Justine at an early date. Accordingly, allowing this case to languish without evidence of a commitment by Father to appropriately address his domestic violence issues would have greatly diminished Justine's early integration into a safe, stable, and permanent home through the adoption process. Therefore, the trial court correctly terminated Father's parental rights pursuant to this ground.

## Mother

We acknowledge that Mother established housing and transportation. She regularly visited her Children and appeared for child and family team meetings and court hearings. However, Mother has continued her relationship with Father – who abused her and the Children – and started using drugs. Mother admits that Father has ongoing anger issues, that

-15-

it was unsafe for him to be near the Children unsupervised, and that he still needed "some type of class to help him learn how to handle his emotions." Remaining in an abusive relationship can constitute a persisting condition warranting termination under this ground. *See, e.g., In re B.D.*, 2009 WL 528922, at *15.

Despite Mother's pattern of subjecting herself to abusive relationships, she failed to take advantage of skills-focused domestic violence victim training and was resistant to counseling. Her refusal to end the abusive relationship or submit to treatment coupled with the addition of her drug abuse demonstrates that she has continued choosing her own desires over the well-being of the Children. Accordingly, these conditions would not likely have been remedied at an early date such that the Children could return to her care. Further, termination was necessary to allow the Children to accomplish early integration into a safe, stable and permanent home. Therefore, the trial court correctly terminated Mother's parental rights on this ground.

In this case, clear and convincing evidence supports the trial court's termination of Father's and Mother's parental rights on the grounds of abandonment by failure to establish a suitable home, substantial noncompliance with the permanency plans, and persistence of conditions.

## B. BEST INTEREST

Having concluded that there was clear and convincing evidence supporting the statutory grounds to terminate the parental rights of Mother and Father, we must consider whether termination of their parental rights was in the best interest of the Children. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services

-16-

agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36–5–101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2012). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests

-17-

are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

Here, neither Mother nor Father made a lasting "adjustment of circumstance, conduct, or conditions" under factors (1) and (2) to make it safe for the Children to return to their care. The domestic violence problems have not been addressed by either parent in therapy or skills courses. Father still has anger issues and has yet to obtain proper housing. Mother has started using drugs and continues to allow Father to frequent her residence. Under factor (5), the therapist testified that Hannah did not want to return to Mother's care when she discovered that Father was still in the picture and that a change in caretakers would be detrimental. The record reveals that the Children are living in an appropriate pre-adoptive foster home. Under factor (6), Father subjected the family to domestic abuse when they lived together, and under factor (7), both parents admitted to using illegal drugs. The record as a whole clearly and convincingly shows that the best interest of the Children would not be served by preservation of the parental rights of Mother and Father. We find that the trial court correctly concluded that termination was in the best interest of the Children.

## V. CONCLUSION

The judgment of the trial court is affirmed. This cause is remanded to the trial court for enforcement of the court's judgment and collection of costs below. Costs on appeal are assessed one-half to appellant Taymie B. and one-half to appellant Justin F.

_____
JOHN W. McCLARTY, JUDGE

-18-